IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Kathy W.,[1] | ) | C/A No.: 1:21-1164-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[2] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, Jr., United States District Judge, dated April 22, 2021, referring this matter for disposition. [ECF No. 8]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 7].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Andrew Saul as the defendant in this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

      A.    Procedural History

On June 13, 2019, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on March 29, 2019. Tr. at 90, 91, 203–09, 210–21. Her applications were denied initially and upon reconsideration. Tr. at 125–28, 133–39. On November 9, 2020, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Ann G. Paschall. Tr. at 38–67 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 24, 2020, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 7–24. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 20, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 44. She completed a master's degree in healthcare management. Tr. at 45. Her past relevant work ("PRW") was as a machine operator, a winder, and a quality inspector. Tr. at 45–48. She alleges she has been unable to work since March 29, 2019. Tr. at 203.

2.    Medical History

On April 2, 2019, Plaintiff presented to the emergency room ("ER") at Greenville Memorial Hospital ("GMH") with a complaint of right lower extremity ("RLE") pain that had begun five days prior. Tr. at 331. She stated she had been unable to sleep or walk without pain. *Id.* Nurse practitioner Mary L. Strossner ("NP Strossner") observed some tenderness in Plaintiff's right leg, but indicated she had no swelling or erythema, minimal varicosities, intact strength, no bruising, and was able to stand and bear weight. Tr. at 332. She noted a vascular exam was intact and a lower extremity ultrasound was negative for deep venous thrombosis. *Id.* She ordered Toradol and Ultram and observed Plaintiff to walk with crutches and right leg support. *Id.* NP Strossner assessed right leg pain, referred Plaintiff for a physical therapy evaluation, and instructed her to continue use of nonsteroidal anti-inflammatory drugs ("NSAIDs") and Ultram at bedtime. *Id.*

Plaintiff followed up with nurse practitioner Donna Johnson ("NP Johnson") on April 5, 2019. Tr. at 375. She complained of right calf pain that was exacerbated by standing. Tr. at 377. NP Johnson observed 4/5 RLE strength, severe tenderness to palpation ("TTP") of the right central calf, antalgic gait, and ambulation with crutches. *Id.* She assessed right calf pain and gastrocnemius tendon strain, prescribed Diclofenac Sodium 5 mg, instructed Plaintiff to elevate her leg and apply warm, most heat, and authorized her to remain out of work until April 15. *Id.*

On April 15, 2019, Plaintiff reported doing no better and indicated she had not started physical therapy because no one had called her to schedule. Tr. at 374. NP Johnson observed Plaintiff to be in mild distress and to ambulate with forward flexion of the thoracolumbar spine, using crutches, and with slowed gait. Tr. at 374–75. She noted Plaintiff had severe TTP to the right central calf and TTP to the right posterior lateral calf. Tr. at 374. She assessed right calf pain, gastrocnemius tendon strain, and right lower limb pain. Tr. at 375. She refilled Ultram and referred Plaintiff for x-rays. *Id.* X-rays of Plaintiff's right tibia and fibula were unremarkable. Tr. at 345.

Plaintiff presented to physical therapist Taylor Harrington Holskey ("PT Holskey") for an initial assessment on April 23, 2019. Tr. at 418–23. She described pain from below the right knee laterally into the ankle and foot and numbness in her right first and second toes. Tr. at 418. PT Holskey noted

Plaintiff had been pushed into the session in a wheelchair and placed most of her weight on her left lower extremity upon standing. Tr. at 419–20. She indicated she was unable to assess Plaintiff's standing lumbar range of motion ("ROM") due to pain and her inability to bear weight on her RLE. Tr. at 420. Plaintiff demonstrated 4/5 strength with bilateral hip flexion, 3⁻/5 strength with right hip abduction, 4/5 strength with left hip abduction, 4/5 strength with bilateral knee flexion, 4⁻/5 strength with right knee dorsiflexion, 4/5 strength with left knee dorsiflexion, 4/5 strength with right great toe extension, and lacked terminal knee extension. *Id.* PT Holskey observed increased muscular tonicity/guarding and pain with palpation through the right greater than left gluteal, tenderness with light posterior to anterior pressure through the lumbar spine in side-lying, intact sensation to light touch, normal reflexes, and slight circumferential disparities between the right and left on girth measurements. *Id.* She noted limited weightbearing tolerance and abnormal gait. Tr. at 421. She felt that Plaintiff would benefit from short-term physical therapy over 10 weeks. Tr. at 422.

On April 25, 2019, Plaintiff reported slight improvement to her RLE pain following an initial physical therapy visit. Tr. at 371. She described pain concentrated in her right calf and lateral lower leg with numbness in her great toe and the second digit of her foot. *Id.* She reported improved pain during the day, but hard, twisting pain that occurred for five minutes at a

time during the night. *Id.* She denied saddle numbness, unilateral weakness, shortness of breath, and chest pain and was ambulating with crutches. *Id.* NP Johnson observed TTP to the right posterior lateral and central calf and slowed ambulation with use of crutches and forward flexion of the lumbar spine. Tr. at 372. She assessed lower limb pain, gastrocnemius tendon strain, right-sided sciatica, and abnormal gait. *Id.* She instructed Plaintiff to continue physical therapy, continued Diclofenac Sodium 50 mg for another week, and prescribed Amitriptyline 10 mg. *Id.*

Plaintiff participated in additional physical therapy sessions on April 26 and 29 and throughout May and June 2019. Tr. at 382–418, 442–537.

On May 22, 2019, Plaintiff confirmed she was participating in physical therapy and indicated her right leg pain had improved during the day and worsened at night. Tr. at 369. She described pain in her lower back that radiated down her right leg and failed to respond to Ultram. *Id.* She denied saddle numbness, bowel or bladder incontinence, and falls. *Id.* NP Johnson observed 4/5 RLE strength, tenderness from L4 to S1 without paravertebral tenderness, TTP in the right central and posterior lateral calf, and slow gait with use of crutches and forward flexion of the thoracolumbar spine. *Id.* She assessed anemia, low back pain, right calf pain, and gastrocnemius tendon strain. Tr. at 370. She ordered x-rays and prescribed Meloxicam and

Cyclobenzaprine. *Id.* The x-rays showed no evidence of acute fracture and mild disc space height loss at L5–S1. Tr. at 344.

On June 28, 2019, Plaintiff complained of lower back pain that radiated down her right leg. Tr. at 367. NP Johnson noted Plaintiff had been attending physical therapy, but her endurance remained poor. *Id.* She further indicated the physical therapist had requested Plaintiff be referred for further evaluation of her spine. *Id.* She described Plaintiff as morbidly obese, but noted she had lost 20 pounds since her prior visit. *Id.* She observed Plaintiff to be ambulating with slowed gait, forward flexion of the thoracolumbar spine, and use of crutches. *Id.* She noted 4/5 RLE strength, tenderness from L4 through S1 without paravertebral tenderness, and tenderness to palpation ("TTP") of the right central and lateral calf. *Id.* NP Johnson assessed low back strain and lumbar radiculopathy, ordered magnetic resonance imaging ("MRI") of the lumbar spine, and instructed Plaintiff to continue weight loss and physical therapy. Tr. at 368.

PT Holskey discharged Plaintiff from physical therapy on July 3, 2019, after 20 visits. Tr. at 382. She noted Plaintiff arrived to the final visit with crutches and a single-point cane, but was ambulating with the cane. *Id.* Plaintiff reported "major improvement" since initiating physical therapy. *Id.* She said she continued to have the same symptoms, but they were "not as bad." *Id.* PT Holskey recorded 4+/5 bilateral hip flexion, 4/5 bilateral hip

abduction; 4+/5 bilateral knee flexion, 4+/5 right knee extension, and 4+/5 bilateral dorsiflexion. Tr. at 383–84. She noted normal reflexes and sensation intact to light touch. Tr. at 384. She indicated Plaintiff's gait was increasingly antalgic without an assistive device. *Id.* PT Holskey stated Plaintiff had "made notable progress across therapy course, but with relative plateau in improvement of RLE symptoms." Tr. at 385. She noted Plaintiff had improved from use of a wheelchair to a single-point cane in the community and no device at home, but continued to be limited in walking tolerance. *Id.* She observed improved gait speed, trunk posture, and active ROM. *Id.*

On July 26, 2019, NP Johnson observed Plaintiff to demonstrate slow gait and limited ambulation without use of crutches. Tr. at 558. She noted 4/5 RLE strength, L4–S1 tenderness without paravertebral tenderness, and TTP in the right central calf and right posterior lateral calf. *Id.* NP Johnson sought Medicaid approval for an MRI. *Id.*

On August 12, 2019, an MRI of Plaintiff's lumbar spine showed a large broad-based disc bulge at L5–S1 that contributed to moderate-to-advanced bilateral neural foraminal narrowing, as well as multilevel facet degenerative changes from L3 through S1 (right greater than left) with small facet joint effusions on the right at each level. Tr. at 550.

Plaintiff followed up with NP Johnson on August 29, 2019. Tr. at 555. NP Johnson observed Plaintiff to be morbidly obese, to have slow gait and

limited ambulation, and to be ambulating without crutches. *Id.* She noted 4/5 RLE strength, tenderness to L5–S1 without paravertebral tenderness, and moderate TTP to the right central calf. *Id.* She assessed degeneration of lumbar intervertebral disc, lumbago with sciatica, and lumbar radiculopathy, noted Plaintiff was not progressing with physical therapy, and referred her to a neurosurgeon. Tr. at 556.

On September 25, 2019, NP Johnson observed Plaintiff to be morbidly obese and to have slow gait and limited ambulation without use of crutches. Tr. at 568. She also noted 4/5 strength in Plaintiff's RLE, tenderness at L4–S1 without paravertebral tenderness, and moderate TTP of the right central calf. Tr. at 569. She assessed lumbago with sciatica, encouraged Plaintiff to keep her appointment with the neurologist, and noted Plaintiff would not need to follow up after she established care with the neurologist. *Id.*

On October 21, 2019, state agency medical consultant Adrian Corlette, M.D. ("Dr. Corlette"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently balance, stoop, and climb ramps/stairs; and occasionally kneel, crouch, crawl, and climb ladders/ropes/scaffolds. Tr. at 74–75, 85–85.

Plaintiff presented to neurosurgeon Christopher Chittum, M.D. ("Dr. Chittum"), as a new patient on October 29, 2019. Tr. at 607. She described low back pain with severe right leg and foot pain and difficulty bearing weight. *Id.* She also described neck pain that radiated into her bilateral trapezius area, right arm, and hand. *Id.* She indicated her pain was exacerbated by sitting or standing for too long, walking for long distances, and emotional upset. *Id.* A neurologic evaluation showed right arm and hand pain, right lateral leg pain, numbness in the toes of the right foot, and right lateral leg numbness. Tr. at 609. Dr. Chittum indicated Plaintiff had 4/5 strength in all extremities. Tr. at 610. He assessed neck pain, lumbar radiculopathy, and spondylolisthesis of the lumbar region. *Id.* He noted Plaintiff had not brought the disc containing the MRI of the lumbar spine to the visit, and indicated he would hold off on recommendations until he was able to review it. *Id.* Plaintiff subsequently dropped off the disc. *Id.* Dr. Chittum reviewed it and recommended interlaminar epidural steroid injections ("ESIs"). *Id.* Plaintiff requested time to consider the procedure. *Id.*

Plaintiff followed up with NP Johnson for medication refills on February 19, 2020. Tr. at 646. She reported Motrin 800 mg provided some relief and denied saddle numbness, bladder and bowel incontinence, and falls. Tr. at 648. NP Johnson observed Plaintiff to have limited ambulation and slow, antalgic gait, but indicated she was not ambulating with crutches.

Tr. at 648, 649. She noted 4/5 RLE strength, tenderness to L4–S1 without paravertebral tenderness, and moderate TTP of the right central calf. Tr. at 648. NP Johnson referred Plaintiff to pain management and encouraged her to lose weight, actively exercise, walk, or engage in water therapy. Tr. at 649.

Plaintiff presented to pain management specialist David Milford Louis Hall, M.D. ("Dr. Hall"), for a new patient consultation on February 26, 2020. Tr. at 624. She reported pain in her lower back, neck, right shoulder, and right leg. *Id.* She described throbbing, shooting, sharp, and tingling pain that interfered with her abilities to sleep and engage in activities of daily living ("ADLs"). Tr. at 625. She indicated her pain was exacerbated by sitting, standing, lying down, lifting, exercising, and walking. *Id.* She stated she feared ESIs and did not desire to proceed with them. *Id.* Dr. Hall observed right straight-leg raising ("SLR") test elicited pain. Tr. at 627. He noted Plaintiff was ambulating with a cane, had no strength deficits in her lower extremities, was able to squat and stand on her heels and toes without assistance, was overweight, and had grossly intact sensation to light touch in both lower extremities. *Id.* He assessed lumbar radiculopathy and recommended additional physical therapy, use of Tylenol for pain, and minimal or no use of NSAIDs. *Id.* He prescribed Gabapentin 300 mg up to three times daily. *Id.* He felt Plaintiff would benefit from an L5–S1

interlaminar ESI or a transforaminal ESI at L5–S1, but acknowledged she was unwilling to pursue those options. *Id.*

State agency psychological consultant Celine Payne-Gair, Ph.D., reviewed the evidence on April 9, 2020, and concluded Plaintiff had no medically-determinable mental impairment. Tr. at 99, 114.

On April 7, 2020, a second state agency medical consultant, Prianka Gerrish, Ph.D., reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs/ladders/ropes/scaffolds. Tr. at 101–03, 116–18.

Plaintiff presented to nurse practitioner Karen Picone ("NP Picone") with complaints of lower back and right leg pain on June 9, 2020. Tr. at 690. She described constant, achy pain in her back with intermittent sharp pain in her back and right leg. *Id.* She endorsed difficulty ambulating and sitting in a chair. *Id.* She had a slow, uneven gait and reported using crutches, at times, to ambulate. *Id.* Plaintiff indicated she was unable to proceed with treatment because the practice was outside her insurance network and she could not afford to pay out-of-pocket. *Id.* She indicated she would speak with her caseworker about treatment options. *Id.*

Plaintiff reported left leg pain on June 24, 2020. Tr. at 644. Joseph Grant, M.D. ("Dr. Grant"), observed morbid obesity, abnormal motor strength, positive SLR on the right at 20 degrees, right wrist and hand pain on the radial side, no tenderness or crepitus with flexion or lateral movement, no erythema or swelling of the wrist or hand, and no bony deformities. Tr. at 646. Plaintiff discussed her fear of ESIs with Dr. Grant, and agreed to proceed with them upon hearing of their safety and benefits. Tr. at 644. Dr. Grant assessed chronic back pain and morbid obesity, prescribed Voltaren gel, and referred Plaintiff to a nutritionist. *Id.*

On July 7, 2020, Plaintiff complained of low back and right leg pain. Tr. at 686. She endorsed difficulty ambulating and sitting in a chair and use of a cane, at times, to ambulate. *Id.* She rated her pain as a seven. *Id.* NP Picone performed electrical stimulation and neuromuscular re-education procedures. Tr. at 688. She planned to proceed with similar procedures twice a week over 10 weeks. *Id.*

On July 8, 2020, electromyography ("EMG") and nerve conduction studies ("NCS") of Plaintiff's lower extremities showed spontaneous potential that might be suggestive of subacute right L5–S1 radiculopathy. Tr. at 679. Lorone Washington, M.D. ("Dr. Washington"), noted additional imaging studies may be necessary. Tr. at 680.

Plaintiff described constant, achy pain in her lower back and bilateral legs on July 9, 2020. Tr. at 676. She reported intermittent, sharp pain with movement and rated her pain as a seven. *Id.* NP Picone performed a second procedure. Tr. at 676–77.

On July 14, 2020, Plaintiff reported temporary relief of tingling in her right leg following the prior treatment. Tr. at 674. She endorsed achy pain in her upper and lower back and rated it as a seven. *Id.* NP Picone administered a third treatment. Tr. at 674–75.

Plaintiff reported decreased discomfort in her right leg and increased discomfort in her left leg on July 16, 2020. Tr. at 672. She described achy pain and tenderness in her lower back and tenderness in her neck. *Id.* She rated her pain as a seven. *Id.* NP Picone administered a fourth treatment. Tr. at 672–73.

On July 21, 2020, Plaintiff reported a little improvement in her symptoms. Tr. at 670. She endorsed intermittent aching, pain, and tightness in her lower back and neck, but said it was less severe. *Id.* NP Picone administered a fifth treatment. Tr. at 670–71.

Plaintiff reported continued improvement in her symptoms on July 23, 2020. Tr. at 668. She described intermittent, achy pain and tightness in her neck and lower back, but said it had been less severe at times. *Id.* NP Picone administered a sixth treatment. Tr. at 668–69.

Plaintiff reported less intense back discomfort on July 28, 2020. Tr. at 666. She described pain in her shoulders and a "knotty" feeling in her right hip she rated as a seven. *Id.* NP Picone administered a seventh treatment. Tr. at 666–67.

Plaintiff reported reduced and more intermittent lower back pain on July 30, 2020. Tr. at 664. She described her upper back as more painful than her lower back and complained of right hip pain. *Id.* She rated her pain as a seven. *Id.* NP Picone administered an eighth treatment. Tr. at 664–65.

On August 4, 2020, Plaintiff reported sharp pain and tightness in her lower back and severe pain with bending the prior weekend that had since resolved. Tr. at 662. She described pain that moved from her shoulders to her lower back. *Id.* She rated back pain as a seven and neck/shoulder pain as a six. *Id.* NP Picone observed Plaintiff to be "very tense" and to sit on the front of the recliner. *Id.* She encouraged Plaintiff to use relaxation techniques to attempt to control her chronic pain. *Id.* She administered a ninth treatment. Tr. at 662–63.

On August 6, 2020, Plaintiff complained of severe discomfort in her lower back with sharp, throbbing pain she rated as an eight. Tr. at 660. NP Picone administered a tenth treatment. Tr. at 660–61.

On August 11, 2020, Plaintiff denied experiencing radiating pain down her right leg, tingling in the toes of her right foot, and achy pain in her upper

back, but reported increased pain in her left lower back and buttocks. Tr. at 657. She described constant, achy pain with intermittent, sharp pain and rated it as a seven. *Id.* NP Picone noted Plaintiff had described anxiety and had been tearful during some visits. *Id.* She observed slight improvement to Plaintiff's ROM, but noted positive SLR on the left. Tr. at 657–58. She administered an eleventh treatment. Tr. at 658–59.

NP Picone administered a twelfth treatment on August 13, 2020. Tr. at 655–56. Plaintiff reported increased relaxation, but some lethargy with use of Cymbalta. Tr. at 655. She described achy pain in her lower back and sharp pain with movements. *Id.* She rated her pain as a seven. *Id.*

Plaintiff presented to NP Picone for her thirteenth treatment on August 18, 2020. Tr. at 653. She reported improved sleep and feeling better overall, but continued to endorse severe, sharp pain in her lower back and legs that was no longer constant. *Id.* She described areas of intense pain in her neck, shoulders, right low back and hip, left lower back, and left thigh and reported discomfort in her hands when she attempted to lift items like a gallon of milk. *Id.* She rated her pain as a seven. *Id.* NP Picone administered electrical stimulation and neuromuscular re-education. Tr. at 653–54.

On August 20, 2020, Plaintiff rated her pain as a seven and described soreness and stiffness in her shoulders, left lower back, left leg, and hands. Tr. at 706. NP Picone administered a fourteenth treatment. Tr. at 706–07.

Plaintiff rated her pain as a seven and described discomfort in her low back, left leg, and right shoulder on August 25, 2020. Tr. at 708. NP Picone noted vitamin D deficiency might be contributing to Plaintiff's discomfort and prescribed a supplement. *Id.* She administered a fifteenth treatment. Tr. at 708–09.

On August 26, 2020, Plaintiff rated her pain as a seven and described tension in her shoulders and achy pain in her lower back. Tr. at 710. She reported having discontinued Cymbalta, as it was causing sleepiness and nausea. *Id.* She complained of depression and anxiety that increased her discomfort. *Id.* NP Picone administered a sixteenth treatment, discontinued Cymbalta, and prescribed Sertraline. Tr. at 710–11.

On September 1, 2020, Plaintiff reported feeling much better and experiencing decreased depression and anxiety since starting Sertraline. Tr. at 713. She rated her pain as a seven and described soreness in her right wrist and low back. *Id.* NP Picone administered a seventeenth treatment. Tr. at 713–14.

Plaintiff reported feeling "so much better" on September 3, 2020. Tr. at 715. She rated her pain as a seven and described achy discomfort in her right hand, low back, and left leg, noting she had been moving more and felt as if she "over did it" on the prior day. *Id.* NP Picone administered an eighteenth treatment. Tr. at 715–16.

Plaintiff reported improvement in her low back and left leg discomfort, rating her pain as a six on September 8, 2020. Tr. at 717. She indicated she had been able to increase her activity, despite some continued achy pain in the morning and at night. *Id.* She was concerned about achy pain across her knuckles that prevented her from holding heavy objects, but denied numbness and tingling. *Id.* NP Picone administered a nineteenth treatment. Tr. at 717–18.

On September 10, 2020, Plaintiff reported feeling much better, being able to sit in a chair for 45 minutes, increased mobility, and improved mood. Tr. at 719. She endorsed right hand pain and rated her pain as a six. *Id.* NP Picone noted Plaintiff's vitamin D level had been very low when tested on August 20 and she had prescribed 50,000 units of vitamin D over an eight-week period. *Id.* She noted pain with active ROM of Plaintiff's neck and back and tenderness in the midline of her lumbar spine, but otherwise normal findings on physical exam. Tr. at 720. She administered a twentieth treatment. Tr. at 720–21. An x-ray of Plaintiff's right hand was normal, and NP Picone referred her for NCS. Tr. at 719.

Dr. Washington administered EMG and NCS on September 16, 2020. Tr. at 722–23. Plaintiff reported constant moderate cervical pain, radiation to the upper extremities, and paresthesia in the right hand. Tr. at 725. She endorsed difficulty grasping objects with her right hand. *Id.* Testing revealed

mild motor and sensory neuropathy of the right median nerves in the region of the right wrist, suggestive of mild right carpal tunnel syndrome ("CTS"), as well as sympathetic skin response. *Id.*

Plaintiff returned to NP Picone with complaints of pain in her left knee, neck, and arm and right hand on October 8, 2020. Tr. at 748. She reported the following on a neck disability index: ability to lift very light weights, taking breaks while reading due to moderate pain, slight headaches that occurred infrequently, ability to concentrate fully with slight difficulty, inability to do usual work, inability to drive as long as she wanted due to moderate pain, fairly severe pain, managing most of her personal care with some help, completely disturbed sleep with five to seven hours of sleeplessness, and hardly any ability to do recreational activities. Tr. at 751. However, she noted her "leg and back were the real issue," although her neck "hurt[] too." *Id.* She also reported moderate difficulty washing her back, moderate-to-severe difficulty carrying a shopping bag or briefcase and using a knife to cut food, and inability to open a tight or new jar, do heavy household chores, and engage in recreational activities requiring force or impact through her arm, shoulder, or hand. Tr. at 752. She indicated her arm, shoulder, or hand problem had interfered with normal social activities slightly to moderately over the prior week. *Id.* She endorsed moderate arm, shoulder, or hand pain and mild to severe tingling in her arm and hand. *Id.*

She represented the pain in her arm, shoulder, or hand caused only mild interference with her sleep, as her back and leg pain caused greater interruption. *Id.* NP Picone observed Plaintiff to have strong right and left grip strength and full ROM throughout the bilateral fingers, hands, and wrists. Tr. at 749. She noted weakness in combined strength with the right second and third fingers and thumb, but moderate strength with the thumb and fourth and fifth fingers. *Id.* She initiated electrical stimulation and neuromuscular re-education to Plaintiff's cervical region and right upper extremity. Tr. at 749–50. NP Picone instructed Plaintiff to wear a brace on her right wrist at night and orthotics in her shoes to help with alignment and alleviate discomfort. Tr. at 748.

On October 13, 2020, Plaintiff complained of achy pain in her right arm and stiffness in her neck. Tr. at 746. She rated her pain as a seven. *Id.* NP Picone administered a second treatment. Tr. at 746–47.

Plaintiff rated achy pain in her right hand as a six on October 15, 2020. Tr. at 744. NP Picone administered a third treatment. Tr. at 744–45.

On October 20, 2020, Plaintiff reported improvement in her right hand with decreased intensity of achy pain. Tr. at 741. She rated her pain as a seven. *Id.* NP Picone administered a fourth treatment. Tr. at 741–42.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing, Plaintiff testified she was 5'2" tall and weighed between 226 and 230 pounds. Tr. at 53. She said she lived in a house with her 10-year-old daughter. Tr. at 44. She stated her daughter was attending school virtually at the time, but she had transported her daughter to school by car prior to the pandemic. *Id.* She confirmed she had a driver's license and was physically able to drive. *Id.* She clarified she usually drove short distances for about 30 minutes at a time and used a balled-up jacket behind her lower back and another item around her neck for support. Tr. at 56. She denied driving alone and said her mother, daughter, or son would ride with her. *Id.* She indicated her family members assisted her because they could view the rear of the car. *Id.*

Plaintiff testified her PRW included a job as a mold line operator at JPS Automotive, where she operated a machine that molded carpet for vehicles. *Id.* She said she was required to stand and perform heavy lifting. Tr. at 45–46. She stated she subsequently worked as a machine operator for Standard Motor Products. Tr. at 46. She explained she had initially worked in a seated position as a winder, lifting trays that weighed about as much as a gallon of milk, but had subsequently been transferred to a standing position

that required she lift about 40 pounds. Tr. at 46–47. She indicated she worked for Minghua as a quality inspector in 2018 and 2019. Tr. at 47. She said the job required significant walking and lifting up to 20 pounds. Tr. at 47–48.

Plaintiff stated she left the job at Minghua because of a reduction in workforce in her department from four to one, leaving her unable to manage the workload on her own. Tr. at 48. She said she started a job at Ultra Staff, but worked for only five weeks due to experiencing pain while walking. *Id.*

Plaintiff testified she continued to walk with a cane, which had been prescribed while she underwent therapy at Roger C. Peace. Tr. at 48–49. She indicated a herniated disc caused the nerve in her leg to hurt and increased pain when she attempted to walk. Tr. at 49. She said she treated her pain with Biofreeze, Aleve, ibuprofen, and muscle rubs. *Id.*

Plaintiff stated she could walk using her cane for about 10 minutes prior to having to stop and rest. *Id.* She indicated she held her cane in her right hand. *Id.* She estimated she could stand for about 10 minutes while leaning on something. Tr. at 50. She said she could sit for approximately 30 minutes because her pain increased if she sat for too long. *Id.* She said she could lift a gallon of milk with her left hand, but not with her right. *Id.* She confirmed she had been diagnosed with CTS and said it made it difficult for her to squeeze a towel. Tr. at 50. She stated the top of her hand and her wrist

were aggravated when she attempted to lift a heavy item. Tr. at 51. She said she had difficulty wiping some areas with her right hand and felt increased pain when she attempted to bend over to tie her shoes or wash her feet. *Id.*

Plaintiff stated she experienced nausea as a side effect of medication. *Id.* She indicated she typically slept for five or six hours at night because her pain would wake her. *Id.* She said she would sometimes take a short nap during the day that lasted 15 to 30 minutes. Tr. at 51–52. She described activities that included watching television, spending time with family, playing bingo and board games, talking, reading the Bible and other books, and performing household chores. Tr. at 52. She said she could wipe the mirrors and sink, but could not clean the toilet because it placed strain on her hand and required she bend. *Id.* She admitted she was able to dust, make her bed, fold towels, and perform other non-strenuous chores. Tr. at 52–53. She said her mother sometimes cooked and they often ate prepackaged meals. Tr. at 53.

Plaintiff explained she had last worked on March 28, 2019, and was unable to walk the following day. Tr. at 54. She said she had been scheduled to close on a home that day and the closing attorney had to assist her to walk. *Id.* She indicated she called out for work the following Monday and visited the hospital the following Tuesday. *Id.* She stated the doctor in the ER prescribed crutches and referred her to therapy at Roger C. Peace. *Id.*

Plaintiff testified she felt constant pain, despite having received treatment. *Id.* She stated her pain was no better and no worse. *Id.* She said she was unable to work due to problems with her back and leg. Tr. at 55. She indicated the herniated disc in her back prevented her from sitting or standing too long and required she switch positions. *Id.* She noted her left knee and leg gave out, causing her to fall. *Id.* She stated her hand was irritated by heavy lifting, but it was "not as bad just holding [her] hand." *Id.* She confirmed she was wearing a hand brace her doctor had recommended she wear mostly a night, but noted she had also indicated she could wear it during the day for additional support. *Id.* She stated she was scheduled to undergo additional NCS. *Id.*

Plaintiff testified her mother and son typically shopped for groceries because she required a motorized cart and Walmart did not always have one available. Tr. at 57. She said her leg pain increased if she attempted to walk on the concrete floor in Walmart. *Id.* She indicated she typically wore slip-on shoes to avoid needing to bend over to tie her shoes. *Id.* She stated her pain never went away, but increased and felt sharper if she attempted to do more than necessary. Tr. at 58. She said she walked slowly because she never knew when her knee would give out, noting that her knee had given out during a therapy session the prior week, but might not do it again for several months. *Id.*

Plaintiff said she had difficulty grasping, fingering, and twisting items and opening jars with her right hand. Tr. at 59. She stated she had not worked in a desk job since 1997. *Id.* She indicated she attended medical appointments twice a week. Tr. at 60.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Carroll Crawford reviewed the record and testified at the hearing. Tr. at 60–66. The VE categorized Plaintiff's PRW as a machine operator II, *Dictionary of Occupational Titles* ("*DOT*") No. 619.685-062, requiring medium exertion and a specific vocational preparation ("SVP") of 3; an inspector/gauger, *DOT* No. 609.684-010, requiring sedentary exertion as performed; and a winder operator, *DOT* No. 681.685-150, requiring sedentary exertion as performed.[3] Tr. at 60–61. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work requiring she lift 10 pounds frequently and 20 pounds occasionally and sit, stand, and walk up to six hours each in an eight-hour day; occasionally climb stairs or ladders, balance, stoop, kneel, crouch, and crawl;

---

[3] The VE's characterization of Plaintiff's PRW is somewhat confusing. The VE initially described the job of winder operator as requiring light exertion and an SVP of 3. Tr. at 61–62. After the VE identified Plaintiff's PRW, the ALJ stated: "I believe actually that it was the winder operator job where she talked [of] being able to sit and not lifting very much. I think the quality inspector she said she was walking all the time." Tr. at 62. The VE responded: "Well then, obviously, I would just adjust my answer to apply to the winder operator rather than quality inspector." *Id.* However, the VE did not offer a different description of the quality inspector position to correct the error.

and frequently handle and finger with the right, dominant hand. Tr. at 62–63. The VE testified the hypothetical individual would be able to perform Plaintiff's PRW as a winder operator. Tr. at 63.

For a second hypothetical question, the ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first question, except that she would be further limited to sedentary work, requiring she lift 10 pounds occasionally and less than 10 pounds frequently, sit up to six hours in an eight-hour workday, and stand or walk for up to two hours in an eight-hour workday. *Id.* The ALJ asked the VE how the restrictions would affect the individual's ability to perform Plaintiff's PRW. *Id.* The VE stated Plaintiff's PRW, as normally performed in the economy, would not be available. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the prior questions, but was further limited to occasional handling and fingering with the dominant hand. *Id.* He asked how the additional restriction would affect the individual's ability to perform Plaintiff's PRW. *Id.* The VE stated Plaintiff's PRW would not be available. *Id.*

The ALJ asked the VE if there would be any jobs available for an individual who was limited as described in the second hypothetical question. *Id.* The VE identified sedentary jobs with an SVP of 2 as a clerical sorter,

*DOT* No. 209.687-022, an order clerk, *DOT* No. 209.567-014, and a brake tester, *DOT* No. 539.485-010, with 142,000, 140,000, and 90,000 positions in the national economy, respectively. Tr. at 64. The ALJ asked the VE if these jobs would be available if the individual were limited to occasional handling and fingering with the dominant hand. *Id.* The VE stated the jobs would not be available. *Id.*

The ALJ asked the VE to consider that the individual would have to use a cane in the dominant hand to perform the standing and walking aspects of any job. *Id.* He asked how the additional restriction would affect the individual's ability to perform Plaintiff's PRW or the jobs previously identified. Tr. at 64–65. The VE stated the individual would be unable to perform Plaintiff's PRW, but could perform the sedentary, unskilled work he had previously identified. Tr. at 65.

The ALJ asked the VE to assume the individual would be unable to maintain concentration and focus for as long as two hours at a time or would require more than the usual number of breaks due to chronic pain. *Id.* He asked if Plaintiff's PRW or the other identified jobs would be available. *Id.* The VE testified no other work would be available. *Id.*

The ALJ asked the VE to assume the individual would be unable to consistently work eight hours a day, five days a week, or would miss two or

more days of work per month. *Id.* He asked if any jobs would be available. *Id.*
The VE stated there would be no full-time work available. *Id.*

The ALJ asked the VE if his testimony had been consistent with the
*DOT. Id.* The VE confirmed that it had, except that he had based his
testimony as to use of a cane, favoring one extremity over another, absences,
and breaks on his experience, as the *DOT* did not address those things. Tr. at
65–66.

### 2.    The ALJ's Findings

In her decision, the ALJ made the following findings of fact and
conclusions of law:

1.    The claimant meets the insured status requirements of the Social
    Security Act through December 31, 2024.
2.    The claimant has not engaged in substantial gainful activity
    since March 29, 2019, the alleged onset date (20 CFR 404.1571 *et
    seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: lumbar
    degenerative disc disease with sciatica, cervical degenerative disc
    disease, right carpal tunnel syndrome, and obesity (20 CFR
    404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of
    impairments that meets or medically equals one of the listed
    impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
    404.1520(d),  404.1525,  404.1526,  416.920(d),  416.925  and
    416.926).
5.    After careful consideration of the entire record, I find that the
    claimant has the residual functional capacity to perform
    sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)
    except she is limited to occasional climbing of stairs or ladders,
    balancing, kneeling, stooping, crouching, and crawling; frequent
    handling and fingering with the dominant right hand; and the
    claimant requires the use of a handheld assistive device (cane)
    when standing or walking.

28

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on June 28, 1972 and was 46 years old, which is defined as a younger individual age 45–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1565 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from March 29, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 12–19.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in assessing an RFC for sedentary work, given Plaintiff's use of a cane and allegations as to limited use of her right hand; and

2)    the ALJ failed to meet the Commissioner's burden at step five.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4)

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982).

---

C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson*

v. *Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.   Analysis

1.   RFC Assessment

Plaintiff argues the ALJ erred in assessing an RFC for a wide range of sedentary work because her ability to use her hands and fingers was limited

by CTS and her ability to occasionally lift and carry articles was limited by her need for a cane. [ECF No. 11 at 7]. She maintains the ALJ's RFC assessment is inconsistent with her allegations that: (1) she could lift nothing heavier than a gallon of milk with her left hand and could lift lesser weight with her right hand; (2) she had trouble squeezing with her right hand; (3) she felt increased pain in her right hand when attempting to lift; (4) she felt increased pain upon bending her right hand; (5) she had difficulty grasping and fingering with her right hand; (6) she had trouble opening jars; (7) she wore shoes without laces to avoid having to tie her shoes; (8) she felt uncomfortable while sitting down; and (9) she had not worked in an office job since the 1990s. *Id.* at 8. She claims she would be unable to use her hands and fingers for repetitive actions, lifting up to 10 pounds, and occasionally lifting or carrying articles like docket files, ledgers, and small tools. *Id.*

The Commissioner argues substantial evidence supports the ALJ's RFC assessment for a range of sedentary work. [ECF No. 12 at 5]. She maintains the ALJ provided a lengthy explanation and cited substantial evidence to support the RFC assessment. *Id.* at 5–8. She contends the ALJ considered Plaintiff's subjective complaints, but explained they were inconsistent with the objective findings and her response to conservative treatment. *Id.* at 9.

A claimant's RFC represents "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In assessing a

claimant's RFC, the ALJ must "consider all of the claimant's 'physical and mental limitations, severe and otherwise, and determine on a function-by-function basis, how they affect [her] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)). The RFC assessment should reflect the ALJ's scrutiny of all the relevant evidence, and she should address all the claimant's medically-determinable impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must include a narrative discussion citing "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explaining how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

In evaluating the claimant's RFC, the ALJ must consider her subjective allegations as to the intensity, persistence, and limiting effects of her symptoms. "[A]n ALJ follows a two-step analysis when considering a

claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ concludes the claimant's impairments could reasonably produce the alleged symptoms, she must proceed to the second step. *Id.* At the second step, the ALJ is required to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). She must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6 (2016). Her assessment of the claimant's symptoms cannot be "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4; *see also Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 98 (4th Cir. 2020) ("We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

In addition to medical evidence, ALJs are to consider other evidence as to the intensity, persistence, and limiting effects of a claimant's symptoms

that includes "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations." SSR 16-3p, 2016 WL 1119029, at *5 (2016); 20 C.F.R. §§ 404.1529(c), 416.929(c). An ALJ must consider factors relevant to a claimant's symptoms, including ADLs; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of the claimant's medications; any measures the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). She must determine "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Pertinent to Plaintiff's argument the ALJ included in the RFC assessment restrictions for sedentary work requiring "frequent handling and fingering with the dominant right hand" and "use of a handheld assistive device (cane) when standing or walking." Tr. at 14. She specified:

> I find the claimant's cervical and lumbar degenerative disc disease, obesity, and right carpal tunnel syndrome support the residual functional capacity's limitation to a range of work at the sedentary exertional level. The claimant's obesity and lumbar

> degenerative disc disease support the additional postural limitations of occasional climbing of stairs or ladders; occasional balancing, kneeling, stooping, crouching, and crawling; and the use of a handheld assistive device (cane) when standing or walking. The claimant's cervical degenerative disc disease and right carpal tunnel syndrome also support the limitations of occasional climbing of ladders, occasional crawling, and frequent handling and fingering with the dominant right hand.

Tr. at 17. Thus, the ALJ considered Plaintiff's impairments in combination on a function-by-function basis and explained how her impairments were accommodated by the specific provisions she included in the RFC assessment.

The ALJ also included a narrative discussion of the evidence to support her conclusions. She acknowledged x-rays showed degenerative and spondylitic changes at C5–6 in October 2019, but there were "no specific objective clinical findings relating to the claimant's neck or upper extremities until the following year, when the claimant was diagnosed with right carpal tunnel syndrome, confirmed through a nerve conduction study performed in September 2020." Tr. at 16. She further wrote:

> The nerve conduction study reported findings of mild motor and sensory neuropathy of the right median nerves in the region of the right wrist, consistent with mild right tunnel syndrome (15F/20). X-ray imaging was negative for any acute osseous process, fracture or malalignment (15F/32). The claimant reports pain and problems with gripping (Hearing Testimony). However, findings on physical examination are generally normal, including strong grip strength, full range of motion of the wrist and fingers, and intact sensation with only some positive findings of moderate strength of the right 5th and 4th fingers and weak strength of the right 2nd and 3rd fingers (13F/3; 16F;9). Additionally, the claimant's treatment has remained conservative, through anti-

inflammatory medication, electric stimulation therapy, and a brace at night (16F).

*Id.* In concluding Plaintiff's CTS did not meet or equal a listing, the ALJ explained "the medical evidence does not demonstrate clinical findings showing that the claimant is unable to use the upper extremities effectively." Tr. at 14.

The ALJ considered Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms, but found them to be "inconsistent with the objective clinical findings and observations in the longitudinal record." Tr. at 17. She noted the record generally showed "no acute distress, no edema, no paraspinous muscle spasm of the lumbar spine, negative straight leg raise bilaterally, normal coordination, no ataxia, and intact sensation, with some positive findings such as positive straight leg raise on the right, some reduced strength, and some reduced range of motion of the lumbar spine (4F/3; 8F/2; 11F/3–4)." *Id.* She recognized that Plaintiff had "never reported saddle numbness, bladder or bowel incontinence, or falls." *Id.* She acknowledged the record showed "an improvement in both objective clinical findings, as well as the claimant's own reported symptoms to providers, through the use of conservative treatment measures." *Id.* She noted Plaintiff's reports that her lower back and right leg pain were relieved by stretching and physical therapy exercises. *Id.* Finally, she stated Plaintiff's reported ADLs included "perform[ing] household chores such as laundry and

other light housework, prepar[ing] simple meals, and driv[ing] a car short distances (9E; 11F/1)." *Id.*

Although Plaintiff alleged her impairments prevented her from using her hands and fingers for repetitive actions, lifting up to 10 pounds, and occasionally lifting or carrying articles like docket files, ledgers, and small tools, the ALJ evaluated her allegations in accordance with 20 C.F.R. § 404.1529 and § 416.929 and gave adequate reasons for rejecting them. While the ALJ found the objective medical evidence supported impairments that could reasonably produce the symptoms Plaintiff alleged, she concluded most of the evidence did not support the alleged severity of symptoms. *See* Tr. at 17. The ALJ explicitly found that conflicts existed between Plaintiff's statements and the rest of the evidence, as the evidence showed normal findings on physical exam of the upper extremities and did not show Plaintiff was unable to use her upper extremities effectively. Tr. at 14, 16. In addition to referencing the objective medical evidence, the ALJ cited Plaintiff's statements to her medical providers, her conservative treatment history, her providers' indications of improvement, and her ADLs as inconsistent with her statements. *See* Tr. at 17.

Plaintiff maintains a conflict exists between the RFC for sedentary work and the provision in the RFC assessment for use of a cane. The relevant SSR addresses sedentary work as follows:

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally means occurring from very little up to one-third of the time, and would generally total no more than 2 hours out of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday.

SSR 96-9p, 1996 WL 374185, at *3. Plaintiff's argument disregards that the ALJ did not find she could perform the full range of sedentary work, but, rather, that she could perform three specific jobs at the sedentary exertional level of clerical sorter, order clerk, and tester. Tr. at 18. The VE specifically testified that the jobs could be performed with the use of a cane in the dominant hand. *See* Tr. at 65. Upon further questioning from the ALJ as to conflicts between his testimony and the *DOT's* job descriptions, the VE stated he had based his testimony that the jobs could be performed with use of a cane on his experience, as the *DOT* did not specifically address use of a cane. *See* Tr. at 65–66. Plaintiff points to no evidence refuting the VE's testimony and has offered no substantiated argument to support a finding that that the ALJ erred in her consideration of use of a cane.

In the light of the foregoing, substantial evidence support the ALJ's assessment of Plaintiff's subjective allegations and her RFC.

2.    Step Five Determination

Plaintiff argues the ALJ failed to meet the Commissioner's burden at step five. [ECF No. 11 at 8-9]. She notes the VE testified a hypothetical individual with her limitations would be unable to perform any jobs. *Id.*

The Commissioner maintains substantial evidence supports the ALJ's step five finding. [ECF No. 12 at 10]. She contends the ALJ needed only include in the RFC assessment and hypothetical questions to the VE the limitations supported by the record and was not required to include additional limitations. *Id.*

The regulations specify ALJs are to take administrative notice of information as to job data in the *DOT.* 20 C.F.R. §§ 404.1566(d), 416.966(d); *see also* SSR 00-4p ("[W]e rely primarily on the *DOT* (including its companion publication, the SCO) for information about the requirements of work in the national economy."). However, to meet the Commissioner's burden at step five, ALJs sometimes must obtain specific testimony from VEs as to job opportunities in the economy. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). An ALJ can only rely on a VE's opinion if it is "based upon a consideration of all the other evidence in the record" and is "in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993).

Plaintiff's second argument hinges on her first, as she relies on alleged limitations the ALJ declined to include in the RFC assessment and maintains these additional limitations would allow for no work. The VE testified a hypothetical individual would be unable to work if she were limited to occasional handling and fingering with her dominant hand; could not maintain attention and focus for as long as two hours at a time and required more than the usual number of breaks in an eight-hour day; or could not consistently work eight hours a day, five days a week and would miss two or more days of work per month. Tr. at 65. However, Plaintiff has failed to produce evidence that her impairments imposed such restrictions on her RFC.

To meet the Commissioner's burden at step five, the ALJ relied on the jobs the VE identified response to a hypothetical question that matched the RFC she included in her decision. *Compare* Tr. at 62–64, *with* Tr. at 14 *and* 18. As discussed above, substantial evidence supports the ALJ's RFC assessment. The ALJ appropriately relied on the VE's opinion, as it was based on all the evidence in the record and was provided in response to a hypothetical question that fairly set out Plaintiff's impairments and the limitations they imposed. Consequently, substantial evidence supports the ALJ's finding at step five.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

November 10, 2021                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge